UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ALICIA ALVAREZ;<br>MINOR CHILD "L.B", through her mother Alicia Alvarez;<br>DIANA BERNAL,<br><br>         Plaintiffs,<br><br>    v.<br><br>CITY OF NEW YORK; the NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES;<br>GLADYS CARRION, in her capacity as commissioner of the Administration for Children's Services;<br>DR. JUANITA GUERRA, individually and in her capacity as an employee and/or contractor and/or employee of a contractor to the New York City Administration for Children's Services and/or the City of New York;<br>THE NEW YORK CITY FAMILY COURT;<br>MARIA DE LA CRUZ, in her capacity as an employee of the City of New York and/or the New York City Administration for Children's Services.<br><br>         Defendants. | JUDGE GARDEPHE<br><br>14 CV 9253<br><br>Civil Action No. _____ |

**COMPLAINT FOR**
**INJUNCTIVE AND OTHER RELIEF**
**AND PETITION FOR A WRIT OF HABEAS CORPUS**
**JURY TRIAL DEMANDED**

Plaintiff(s) ALICIA ALVAREZ, and MINOR CHILD "L.B", through her mother, Alicia

Alvarez, for their complaint against defendants the CITY OF NEW YORK, the NEW

YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES, GLADYS CARRION, in her capacity as commissioner of the Administration for Children's Services, DR. JUANITA GUERRA, individually and in her capacity as an employee and/or contractor and/or employee of a contractor (Montego Medical Consulting P.C.) to the New York City Administration for Children's Services and/or the City of New York, MARIA DE LA CRUZ, in her capacity as an employee of the City of New York and the New York City Administration for Children's Services, allege as follows with all allegations stated upon information and belief:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 1343(a) (3)-(4) and 42 U.S.C. § 1983.

2. Jurisdiction over Plaintiff's state law claims is conferred by 28 U.S.C. § 1367.

3. Venue is proper in this Court based upon 28 U.S.C. §§ 1391 (b) and (c).

## PARTIES

4. At all times hereafter mentioned, Plaintiff ALICIA ALVAREZ (hereinafter, "Ms. Alvarez") is an individual living in the State of New York, City of New York, County of Queens.

5. At all times hereafter mentioned, Plaintiff DIANA BERNAL (hereinafter, "Ms. Bernal") is an individual living in the State of New York, City of New York, County of Queens.

6. At all times hereafter mentioned, Plaintiff MINOR CHILD L.B. through her mother, Alicia Alvarez (hereinafter, "L.B.") is a minor child, an individual living in the State of New York, City of New York, County of Queens.

7. Defendant City of New York (hereinafter, the "City") is a municipal corporation duly organized and operating pursuant to the Laws of the State of New York and the New York City Charter.

8. Defendant the New York City Administration for Children's Services (hereinafter, "ACS") is an agency of the City of New York

9. Defendant Gladys Carrion ("Carrion") is the Commissioner of ACS. As Commissioner of ACS, Defendant Carrion is a policymaker for the City, who is responsible for making and/or approving policies for ACS, including policies regarding the removal and detention of children from their families, the placement and maintenance of children in foster care, and the training and supervision of ACS employees and contractors. As Commissioner of ACS, Defendant Carrion is responsible for ACS's compliance with the Constitution, statutes, regulations, and common law of the United States and the State of New York. Defendant Carrion, accordingly, supervises all other Defendants.

10. At all times hereinafter mentioned, Defendant Dr. Juanita Guerra (hereinafter, "Dr. Guerra") was an individual and employee and/or contractor and/or employee of a contractor of the ACS and/or the City of New York

11. Defendant The New York City Family Court (hereinafter, the "Family Court") is the Family Court of the City of New York.

12. At all times hereinafter mentioned, Defendant Maria De La Cruz (hereinafter, "Ms. De La Cruz") was an individual and employee of the ACS and/or the City of New York.

## FACTUAL BACKGROUND
## SUMMARY OF FACTUAL BACKGROUND

1. On or about the spring of 2003, Ms. Alvarez sought the assistance of ACS because her daughter Joana Bernal, the biological mother of all the children, L.B (Date of Birth 4/01/1998), J.C. # 1 (Date of Birth, 4/13/2000), J. C. # 2 (Date of Birth, 11/06/2001), J.C. # 3 (Date of Birth 5/12/2004), (not yet then born), J.C. # 4 (hereinafter, the "Children") seemed increasingly depressed because of the beatings she was suffering at the hands of Juan Cantu, the father of a number of the children, as well as her problems with drug addiction.

2. ACS referred her daughter, Joana Bernal, to a private contractor of ACS, a company called Vida Family Services.

3. Vida Family Services appointed a psychologist to assist Ms. Joana Bernal, an individual named George Alejandro, who is currently Director of Clinical Services at Vida Family, who a) began a sexual relationship with Ms. Joana Bernal, b) impregnated Ms. Joana Bernal, c) threatened to kill the brothers of Ms. Joana Bernal and Ms. Diana Bernal (the sons of Alicia Alvarez) and to otherwise utilize his considerable political influence to destroy the family if the family revealed the breach of his professional ethical responsibility, d) physically assaulted Ms. Joana Bernal in an attempt to abort the child in order to conceal the breach of his professional ethical responsibility, an assault which necessitated hospitalization due to the incessant bleeding from her vagina, the result of his forcibly inserting his fingers into her vagina, and e) when Ms. Alicia Alvarez attempted to call the attention of the police to his assault on Ms. Joana Bernal, lied to police officers, telling them that Ms. Alvarez was a "crazy woman" and

presenting them with his psychologist credentials, Vida Family and/or New York City Identification to convince them to drop the investigation.

4. The Alvarez-Bernal family, despite Mr. George Alejandro's threats, continued to pursue an action against him regarding his paternity of J.C. # 3.

5. In 2008, after the Alvarez-Bernal family were provided with bed-bug ridden mattresses by a contractor of ACS, and complained about this fact, they were told that they would be sent to a shelter while the issue was resolved, but that Ms. Alvarez would have to submit to a psychological evaluation.

6. During the evaluation, the ACS private contractor psychologist, Dr. Juanita Guerra, attempted, without Ms. Alvarez' permission, to utilize her as "guinea pig" to improve her hypnotism skills, and when Ms. Alvarez demonstrated herself to be impervious to hypnotism, and rather made a comment to Dr. Guerra of a religious nature, regarding her belief that "Jesus" could save her, Dr. Guerra, who has demonstrated, through her own statements on the internet, that she holds religious beliefs diametrically opposed to Ms. Alicia Alvarez' religious beliefs, exploded with rage, and instructed ACS and/or its contractor to take Ms. Alicia Alvarez' children and grandchildren out of her home, as she was a "crazy woman". This determination that Ms. Alvarez was a "crazy woman" led to a consummated act, the taking of the Children from the home, and was based on her negative animus towards Ms. Alvarez' religious beliefs, in flagrant violation of the United States Constitution and New York State Constitution prohibition against Religious Discrimination by the government (and/or its agents and/or private contractors).

5

7. The children and grandchildren of Ms. Alvarez were taken out of her home, and during the Family Court proceedings that followed which presently are directed towards the actual adoption of the Children by the foster parents (who the Alvarez-Bernal family have accused of a) having failed to have administered proper medical assistance to the children, b) having permitted the sexual abuse of one of the children by the eldest son of the foster parents, c) having permitted the physical abuse of one of the children by another son of the foster parents, and d) having subjected to extreme forms of physical abuse, including the burning of hands on a stove), the New York City Family Court, the lawyers for ACS, the lawyers for New York Foundling, and the lawyers for the children, all of whom are compensated by the City of New York, have conspired to quite effectively suppress the allegations of the Alvarez-Bernal family against the foster parents, in order to protect the City of New York and its private contractors.

8. All of this has been accomplished in exchange of what is, in effect, a bribe and/or threat by certain persons employed by, and/or compensated by, the City of New York, directed to various officers of the court in the form of what is, in effect, a) a promise that if they would assist the City of New York and its private contractors, they would receive future contracts with these, and b) a threat that if they refused to assist the City of New York and its private contractors, these contracts, which constitute the very livelihood of the lawyers involved, would be refused to them.

9. To add insult to injury, not only did these lawyers, and the New York City Family Court, conspire to suppress these allegations, and to disregard and suppress the well substantiated allegations of religious discrimination, which discrimination

6

resulted in the removal of the Children from the Alvarez-Bernal home, but in addition, the attorneys for ACS and New York Foundling actually submitted a motion to the Family Court to suspend all visits by Ms. Alicia Alvarez, Ms. Joana Bernal, and Ms. Diana Bernal to see the Children, based in substantial part on the fact that Ms. Alicia Alvarez, Ms. Joana Bernal, and Ms. Diana Bernal had been praying over the Children during a visit with the Children, and through the conspiratorial acts and general disregard of due process by the New York City Family Court Judge, Judge Linda Tally, prevailed upon such motion, all in flagrant violation of the United States Constitution and New York Constitution's prohibition against Religious Discrimination, so that the Children have not been able to see their family for over one year.

10. Thus, the Defendants have conspired to destroy a family, to separate parent, grandparent, and uncles and aunts, from the Children, and to place the Children in a foster home in which they are physically and sexually abused, although there have been no credible allegations whatsoever that the grandparents, and aunts and uncles constitute any danger to the Children, based upon the fact that the grandparent, uncles and aunts' actions in defiance of the conspiring entities who hope to silence them have resulted in an inconvenience to them and a threat to their continued livelihood derived from taxpayer funds.

### George Alejandro and Vida Family

11. On or about the spring of 2003, Ms. Alvarez sought the assistance of ACS because her daughter, Joana Bernal, the mother of the Children, seemed increasingly depressed because of the beatings she was suffering at the hands of

Juan Cantu, the father of some of the Children and her problems with drug addiction.

12. ACS referred her daughter, Joana Bernal, to a private contractor of ACS, a company called Vida Family Services.

13. Upon information and belief, ACS does not have its own, in-agency capability to handle this type of work, but rather, functions in this regard as a distributor of tax payer funds to private contractors, such as Vida Family.

14. Many of these private contractors, upon information and belief, receive such lucrative tax payer funded contracts on the basis of political connections and nepotism, and not, primarily, based on such factors as cost effectiveness and the quality of the personnel providing such services, as the personnel providing such services often receive their position within the private contractor based on considerations of political connections, and nepotism, as well.

15. Vida Family provided Ms. Bernal with a psychologist or psychiatrist named George Alejandro.

16. Upon information and belief, Mr. George Alejandro is politically connected and, may have family members who are elected and/or appointed officials of New York City and/or New York State who have enabled him to be awarded a position for which he is far less than qualified, both intellectually and ethically.

17. Joana Bernal proceeded to attend therapy sessions for her condition as a battered woman and a drug addict with Mr. George Alejandro at Vida Family in Manhattan.

18. However, on the night of the Northeast Blackout of 2003, August 14th, 2003, Mr. George Alejandro took his patient, Joana Bernal, to a hotel, and had sexual relations with his patient there.

19. After that date, Mr. George Alejandro appeared at the home of Alicia Alvarez and asked to see Joana Bernal.

20. Alicia Alvarez considered it odd that Mr. George Alejandro would come to their home to visit Joana Bernal, since she was not aware that the program with Vida Family involved home visits.

21. Alicia Alvarez protested to Mr. George Alejandro, *"Perdone, pero mi hija no tiene que venir a la oficina suya, a consultorio? Porque viene usted acqui?"* ("Excuse me, but doesn't my daughter have to come to your office, your consulting room? Why have you come here?").

22. Mr. George Alejandro presented to Ms. Alvarez his Badge from ACS or Vida Family, and informed her, *"No, tu sabe que yo soy el psicologo de su hija y yo puedo venir a la casa a chequear"* ("No, you know that I am the psychologist of your daughter and I can come to the house to check").

23. Thus, based upon the authority provided to him by the City of New York, ACS, and/or Vida Family, Mr. George Alejandro convinced Ms. Alvarez to permit him access to her home, and access to her daughter, Joana Bernal.

24. Subsequently, Mr. George Alejandro entered Joana Bernal's room, and Ms. Alvarez witnessed Mr. George Alejandro massaging Joana Bernal's legs, and when Ms. Alvarez inquired as to the purpose of his massaging Joana Bernal's legs, Mr. George Alejandro informed her that he was conducting an evaluation of

Ms. Bernal and the purpose of his massaging her legs was to "lower her stress" levels.

25. Upon information and belief, thus, Mr. George Alejandro was invested with power from Vida Family and ACS to gain access to the private residence of Ms. Alvarez and Joana Bernal and utilized that power to have relations of a sexual nature with his patient, Ms. Joana Bernal, the adult daughter of Ms. Alvarez, who was also his patient.

26. Based on that visit, Ms. Alvarez determined that, since Mr. George Alejandro's visit and behavior was exceedingly strange and unprofessional, she would install a camera to provide a taped recording of any subsequent visits.

27. Thus, on a subsequent visit by Mr. George Alejandro to their private residence, Ms. Alvarez turned on a large camera, which she placed next to the television overlooking the bed in Joana Bernal's room.

28. In that video, Mr. George Alejandro can be seen talking to Ms. Joana Bernal in a suggestive fashion and massaging Ms. Joana Bernal in a sexual manner, and then, obviously noticing the camera by the television, and considering the possibility that it might be taping, taking off his jacket and draping the same over the camera to block its view of his acts.

29. After Ms. Alvarez viewed the video, and discovered what Mr. George Alejandro was doing with her daughter, his patient Joana Bernal, she threatened to call the police.

30. At that point Mr. George Alejandro informed her that, *"No puede llamar a la policia porque tengo mucho poder. Y si usted hace algo, yo se que usted tiene dos*

10